# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
### November 21, 2014 Session

## DAVID H. MCCORD v. HCA HEALTH SERVICES OF TENNESSEE, INC.

### Appeal from the Circuit Court for Davidson County
### No. 13C291     Carol Soloman, Judge

---

### No. M2014-00142-COA-R3-CV - Filed April 27, 2015

---

A hospital instituted a review of an orthopaedic surgeon's removal of spinal hardware from patients within one year of implantation; the review resulted in a peer review proceeding under the hospital's bylaws and the eventual revocation of the doctor's surgical privileges. The doctor filed suit for breach of contract, defamation, common law and statutory disparagement, and intentional interference with business relationships, arising out of the revocation of his surgical privileges. Upon the hospital's motion to dismiss all claims for failure to state a claim for relief, the court dismissed the breach of contract claims. The hospital subsequently moved to dismiss the remaining claims for lack of subject matter jurisdiction or, in the alternative for summary judgment; the court granted the motion to dismiss and denied summary judgment. Doctor appeals the dismissal of his claims; hospital appeals the denial of its motion for summary judgment. We affirm the dismissal of the breach of contract claims and reverse the dismissal of the tort claims for lack of subject matter jurisdiction; we hold that the hospital is entitled to summary judgment on the remaining claims and dismiss the case.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed in Part and Reversed in Part; Case Dismissed

RICHARD H. DINKINS, J., delivered the opinion of the court, in which ANDY D. BENNETT and W. NEAL MCBRAYER, JJ., joined.

C. Bennett Harrison, Jr., Jennifer M. Lankford, Dan Warlick and John D. Kitch, Nashville, Tennessee, for the appellant, David H. McCord, M. D.

C. J. Gideon, Jr. and Mark Hammervold, Nashville, Tennessee, for the appellee, HCA Health Services of Tennessee, Inc., d/b/a Centennial Medical Center.

**OPINION**

**I. FACTUAL BACKGROUND**[1]

This appeal arises from a suit filed by Dr. David McCord, an orthopedic surgeon who held spinal surgery privileges at Centennial Medical Center ("Centennial"), against HCA Health Services of Tennessee, Inc. ("HCA"), which owns and operates Centennial, to redress the revocation of his surgical privileges. Dr. McCord was granted privileges to perform spinal surgery at Centennial in 1991, and by 2010, received privileges to perform surgery to implant hardware into patients to secure the bony structures of the spine.

In 2010, Ilene Marshall, an administrative quality coordinator for the departments of surgery, anesthesia and ophthalmology, was assigned to collect data regarding patients who had spinal hardware removed within one year of placement and to look for any "hardware failure" in connection with the removals. The data she collected showed that Dr. McCord had 19 patients whose spinal hardware was removed within one year of implantation and that none of the patients had any "hardware failure." Dr. Michael Schlosser, the Chief of Surgery at Centennial, was subsequently asked to review the patient files to determine the appropriateness, propriety and necessity of the 19 surgeries.

In May 2011, Dr. McCord met with Dr. F. J. Campbell, Centennial's Chief Medical Officer, who told him that the 19 cases "represented and divulged problems with [his] practice"; the renewal of Dr. McCord's surgical privileges was also discussed. Centennial then sent the files to a physician in Oregon for outside review; at Dr. McCord's request, the files were also sent to an orthopedic surgeon in California.

Thereafter, pursuant to its Medical Staff Bylaws[2], Centennial's Medical Executive Committee ("MEC") appointed an ad hoc committee comprised of Dr. Schlosser, Dr. Roger Passmore, an orthopedic surgeon specializing in foot and ankle surgery, and Dr. Brandon

---

[1] The recitation of facts is derived primarily from the allegations in the complaint unless otherwise noted. Because the case was resolved in part on a Tenn. R. Civ. P. 12.02(6) motion to dismiss, we treat the allegations of the complaint as true. *Cullum v. McCool*, 432 S.W.3d 829, 832 (Tenn. 2013).

[2] In their briefs on appeal, the parties at various points cite to bylaws which were attached as Exhibits 3 and 4 to the complaint; the bylaws in the exhibits are not the same, and there are differences in the numbering of some sections. For sake of consistency, in this opinion we shall refer to the bylaws which were attached as Exhibit 4 to the complaint.

Downs, Chief of Orthopedic Surgery, to investigate Dr. McCord.[3] On June 6, 2011, the MEC met with Dr. McCord and informed him that his "hardware removal rate within one year of implantation was 7.5% and that the next highest rate of the approximately one dozen surgeons who performed the same or similar surgery at Centennial was 1.5%."

On October 13, 2011, pursuant to Section 6.3 of the bylaws, Dr. John Wilters, President of the Medical Staff and Chairman of the MEC, sent Dr. McCord a letter reporting that the MEC had met and reviewed the ad hoc committee's report and recommendation regarding his privileges; the letter stated that Dr. McCord's privileges were suspended and that a follow-up letter would provide a summary of his rights under the fair hearing process. On October 19, Dr. Wilters sent a letter to Dr. McCord which detailed his rights under the bylaws and the reasons for the adverse action. On October 27, Dr. McCord sent a letter to Thomas L. Herron, CEO of Centennial, requesting a hearing to contest the suspension and recommendation for permanent revocation of his privileges; on December 9, Centennial notified Dr. McCord by letter that a hearing would be held on January 9, 2012.[4]

On January 4, 2012, Dr. McCord, through his counsel, sent a letter to counsel for Centennial memorializing their conversation on January 3, wherein his counsel was advised of the names of the hearing panel members; the letter questioned the impartiality of the hearing panel and asked that the hearing be postponed due to insufficient time to prepare for

---

[3] Section 6.5.1.1. of the bylaws provides:

> When a question involving clinical competence or professional conduct is referred to, or raised by the Medical Executive Committee, the Medical Executive Committee shall review the matter and determine whether to conduct an investigation or to direct the matter to be handled pursuant to another policy, such as the;[sic] practitioner health issues policy;[sic] peer review policy, or to proceed in another manner. In making this determination, the Medical Executive Committee may discuss the matter with the individual. An investigation shall begin only after a formal determination by the Medical Executive Committee to do so.

[4] The December 9 letter also apprised Dr. McCord of the witnesses that Centennial planned to call at the hearing, of further concerns with his practice, and of his rights with respect to the hearing. The letter advised Dr. McCord that his personal presence was required and that he risked forfeiting his right to the hearing if he failed to appear without good cause.

Centennial's witnesses.[5] On January 9, counsel for Dr. McCord sent a letter to Dr. Geoffrey Smallwood, the chairman and presiding officer of the hearing panel, stating in pertinent part:

> After serious consideration, Dr. McCord has determined that he would not want to practice at Centennial based upon what he perceives to be a hostile environment toward him.
>
> Dr. McCord further is of the opinion that he simply cannot get a "fair" hearing based upon information we have obtained in preparation for tonight's hearing, and he does not wish to incur the extra expense of going through the charade of presenting a case when the conclusion has already been agreed upon by the MEC. Accordingly, you are advised that Dr. McCord will not attend or participate in the fair hearing process at Centennial Medical Center. I wanted to let you know as soon as possible following his decision so that you could make whatever arrangements or inform those individuals involved to avoid further disruption of their schedules.

The hearing proceeded as scheduled before a panel consisting of Dr. Smallwood, Dr. Mark Christoferson, a pediatric orthopedic surgeon, and Dr. Mark Flora, a urologist[6]; Dr. McCord did not attend. Centennial presented the testimony of Dr. Schlosser, Ms. Marshall, and Dr. Michael Metzman, a neuroradiologist, along with several exhibits; the panel approved the MEC's recommendation to suspend and permanently revoke Dr. McCord's

---

[5] With respect to the asserted impartiality of the hearing panel, the letter stated:

> With that large a group to pick from, we have somehow managed to choose three which include (1) a surgeon who does all the opening and closing for Drs. Berkman and Schlosser, with whom David has some history, who has refused to work with David when requested to do so, and who is partners with a physician who is married to Mr. Gideon's partner; (2) another surgeon who was involved in the summary suspension of Dr. McCord based upon a charting matter; and (3) Dr. McCord's college roommate who has also been represented in the past, I believe, by Mr. Gideon. All we are looking for is a panel who is unbiased and who has no dealings or connections, whether good or bad, with Dr. McCord.

The letter also stated that counsel for Dr. McCord did not receive the December 9, 2011 letter setting the hearing date until December 12 and had not had adequate time to discuss the issues with experts due to the holidays.

[6] In the January 4 letter, Dr. McCord took issue with the hearing panel which was composed of Drs. Polk, Cristoferson, and Smallwood. Dr. Polk was subsequently removed and replaced with Dr. Flora prior to the hearing. No explanation is given in the record for Dr. Polk's removal or for the retention of the other doctors.

surgical privileges.[7] Centennial's Board of Trustees affirmed the MEC's recommendation on February 23. On March 2, Centennial submitted an "Adverse Action Report" to the National Practitioner Data Bank ("NPDB"), which reported the following relative to Dr. McCord:

> Practitioner first came under scrutiny in June 2011 after evaluation of the practitioner's professional performance revealed concerns over the number of spinal surgery patients returning to the operating room within twelve months of the date of their original fusion procedure. An investigation was conducted by an ad hoc committee and the findings presented to the Medical Executive Committee. The MEC decided to summarily suspend the practitioner's privileges as of October 13, 2011 and recommend termination of the practitioner's medical staff membership. A fair hearing was conducted to consider the practitioner's appeal of the MEC's recommendation. The hearing committee found that the practitioner had a pattern of performing spine surgeries on patients for whom surgery is not indicated. The hearing committee approved the MEC's recommendation after affirming that the recommendation had a substantial factual basis and it was not arbitrary, unreasonable, or capricious. The Board of Trustees affirmed the MEC's recommendation on February 23, 2012.

On January 18, 2013, Dr. McCord filed a complaint against Centennial[8] asserting causes of action for breach of contract for violating the bylaws and failing to follow them in good faith, defamation, common law and statutory disparagement, and intentional interference with existing and prospective business relationships. He also sought a declaration that Centennial unjustifiably revoked his privileges and injunctive relief, specifically, reinstatement of his privileges and that Centennial be required to report his reinstatement to the NPDB.

Centennial moved to dismiss Dr. McCord's claims on the ground that the complaint failed to state a claim for relief pursuant to Tenn. R. Civ. P. 12.02(6). On May 10 and 21, 2013, the court held a hearing on Centennial's motion and on June 27 entered an order

---

[7] A transcript of the hearing was referenced in the complaint and attached as Exhibit 10; the transcript was not included in the record on appeal. Our recitation of what transpired at the hearing is taken from Exhibit 11 to the complaint, the Fair Hearing Committee Report.

[8] Dr. McCord's complaint lists "HCA Health Services of Tennessee, Inc. d/b/a Centennial Medical Center" as the Defendants. Because the peer review proceeding took place at the direction of Centennial's MEC, we will refer to the Defendants collectively as Centennial.

dismissing the breach of contract claims; the court denied the motion as to the remaining claims, stating that it needed more information before ruling.

Centennial thereafter filed a motion to dismiss the remaining claims for lack of subject matter jurisdiction pursuant to Tenn. R. Civ. P. 12.02(1) on the ground that Dr. McCord failed to exhaust his administrative remedies prior to filing the action or, alternatively, for summary judgment; the court granted the Rule 12.02(1) motion. The court also denied Centennial's motion for summary judgment on the basis that there was a genuine issue of material fact as to whether the NPDB report was false and made with knowledge of its falsity. On appeal, Centennial argues that, if we determine that dismissal under Rule 12.02(1) was inappropriate, it is entitled to summary judgment on Dr. McCord's remaining claims.

Dr. McCord raises the following issues on appeal:

1. Whether the trial court improperly made findings of fact in granting Centennial's motion to dismiss on the pleadings and therefore erred in dismissing Dr. McCord's breach of contract claims by finding that Dr. McCord waived those claims as a matter of law?
2. Whether the trial court erred in dismissing Dr. McCord's claims of defamation, common law disparagement, disparagement under the Tennessee Consumer Protection Act, and intentional interference with business relationships for lack of the subject matter jurisdiction by finding that Dr. McCord must exhaust certain administrative remedies in order to advance those claims against Centennial?

## II. DISCUSSION

### A.) Breach of Contract Claims

The trial court dismissed the breach of contract claims, Counts I and II, pursuant to Tenn. R. Civ. P. 12.02(6), the purpose of which is to determine whether the complaint states a claim upon which relief can be granted. In Count I, Dr. McCord alleged that Centennial violated its bylaws, thus breaching its contract with him, by: not following the proper procedures prior to suspending his privileges and doing so without sufficient information that there was a quality of care concern or harm to any of his patients; failing to state the reasons for his suspension with enough specificity to allow a response; allowing counsel for the MEC to select the hearing panel, represent the MEC at the hearing, and act as a "legal consultant" to Centennial; failing to respond to his challenges to the hearing panel's composition and to his request to postpone the hearing; giving inadequate time to prepare for additional

witnesses at the hearing; failing to send the hearing committee report within 30 days of the hearing; "raising the issue as to previous hearings that were confidential under the bylaws"[9]; acting in bad faith during the peer review process; and acting in bad faith by revoking his privileges without due process. Count II alleged that Centennial failed to carry out its obligations under the bylaws in good faith.[10]

Centennial moved to dismiss Dr. McCord's complaint on the grounds that Centennial was immune from liability under the Health Care Quality Improvement Act ("HCQIA"), 42 U.S.C. § 11101, *et seq*.; that Dr. McCord voluntarily waived his claims by failing to attend the fair hearing on January 9, 2012; that the claim for breach of contract was time-barred and "fail[ed] to plead facts demonstrating substantial non-compliance with the applicable bylaws"; that the claim for defamation was time-barred and failed to plead facts sufficient to state a claim; that the claims for common law disparagement and statutory disparagement pursuant to Tenn. Code Ann. § 47-18-104(b)(8), were time-barred and failed to assert a recognizable cause of action in Tennessee; and the claim for intentional interference with business relationships failed to plead facts sufficient to state a claim. The court granted the motion as to the breach of contract claims, holding:

> This Court finds that Dr. McCord waived his procedural right to a Fair Hearing when he notified the Chairperson of the Hearing Panel pursuant to

---

[9] Dr. McCord does not explain the "previous hearings" to which he refers.

[10] Attached to the complaint were several exhibits: (1) a letter dated July 12, 2011 from Dr. Brandon Downs, Chairman of the Department of Orthopedics, to Dr. McCord concerning the standard of care for the use of epidural catheters for post-operative pain control; (2) a letter dated October 13, 2011 from Dr. John Wilters, President of the Medical Staff and Chairman of the Medical Executive Committee, notifying Dr. McCord that his surgical privileges were suspended pursuant to Section 6.3 of the bylaws until the conclusion of an administrative review and fair hearing process; (3) a letter dated October 19, 2011 from Dr. Wilters outlining concerns regarding Dr. McCord's practice, setting forth his rights under the bylaws, and including Article 7 of the bylaws as an attachment ; (4) the Medical Staff Bylaws; (5) the October 27, 2011 letter from counsel for Dr. McCord to Mr. Herron; (6) a letter dated December 9, 2011 from counsel for Centennial to counsel for Dr. McCord giving Dr. McCord written notice of the Fair Hearing and providing a list of Centennial's witnesses, reiterating the concerns expressed in the October 13 letter, and advising of Dr. McCord's rights at the hearing and post-hearing; (7) a letter dated January 6, 2012 identifying three additional witnesses for Centennial; (8) the January 4, 2012 letter from counsel for Dr. McCord to counsel for Centennial; (9) the January 9, 2012 letter from counsel for Dr. McCord; (11) and the Fair Hearing Committee Report, summarizing the proceedings at the hearing and giving the reasons for the approval of the recommendation to revoke Dr. McCord's privileges. As noted in footnote 7, the complaint identifies Exhibit 10 as the transcript of the January 9 hearing, which was not included in the record on appeal. In considering a Rule 12.02(6) motion, we review only the complaint, *Marceaux v. Thompson*, 212 S.W.3d 263, 266 (Tenn. Ct. App. 2006); we also review any exhibits attached to the complaint in accordance with Tenn. R. Civ. P. 10.03.

correspondence dated January 9, 2012 and attached to the complaint as Exhibit 9, that he intended to withdraw his request for a Fair Hearing and by then failing to appear at the Fair Hearing. For this reason, this Court grants the defendant's Motion to Dismiss the plaintiff's breach of contract claims, Counts I and II of the Complaint.

Citing Section 7.5.1 of the bylaws, Dr. McCord contends that the court erred in determining that he waived his right to a hearing because he had "good cause" for not attending the hearing.[11] Section 7.5.1 of the bylaws provides:

> The personal presence of the practitioner who requested the hearing shall be required. A practitioner who fails without good cause to appear and proceed at such hearing shall be deemed to have waived his/her rights in the same manner and with the same consequence as provided in Section 7.3.4.[12]

He argues that the term "good cause" is ambiguous and that the determination of whether he had "good cause" to not attend the hearing is a "question of fact inappropriate for resolution by the trial court." In effect, Dr. McCord is asking this court to interpret the bylaws and make an independent determination of whether he had good cause not to attend the hearing. Our analysis of the issue of waiver, however, is not based on the manner in which that term is used in the bylaws; rather, it is in a broader context, one which involves the effect of Dr.

---

[11] Dr. McCord asserts that Centennial's failure to provide sufficient information concerning the complaint against him, to specify the content of the testimony of anticipated witnesses, to select an impartial hearing panel, and to respond to or grant his request for a postponement of the hearing establish "good cause" for him not to appear.

[12] Section 7.3.4 states:

FAILURE TO REQUEST A HEARING

A practitioner who fails to request a hearing within the time and in the manner specified in Section 7.3.3 waives any right to such a hearing and to any appellate review to which he/she might otherwise have been entitled. Such waiver in connection with:

> 7.3.4.1 An adverse recommendation by the Medical Executive Committee shall constitute acceptance of that recommendation, which shall become effective pending the final approval of the Board.
> 7.3.4.2 An adverse recommendation by the Board shall constitute acceptance of that action, which shall become immediately effective as the final decision by the Board.

McCord's conduct relative to his rights under the bylaws as well as his claim that those rights were breached.

In resolving whether Dr. McCord waived his rights under the bylaws, we are guided by the following statement from *Regions Bank v. Thomas*:

[W]aiver is an intentional relinquishment of a known right and is a doctrine of very broad and general application. It concedes a right, but assumes a voluntary relinquishment of it. Our courts have held that there must be clear, unequivocal and decisive acts of the party of an act which shows determination not to have the benefit intended in order to constitute a waiver.

422 S.W.3d 550, 561 (Tenn. Ct. App. 2013) (quoting *Collins v. Summers Hardware and Supply Co.*, 88 S.W.3d 192, 201–02 (Tenn. Ct. App. 2002)).

Centennial's October 19, 2011 letter set forth Dr. McCord's rights under the bylaws. Specifically, the letter stated that he had the right to request a hearing to contest the MEC's recommendation and the penalty if he failed to request a hearing; the letter also included a copy of the hearing procedures contained at Article 7 of the bylaws. Dr. McCord exercised his right to request a hearing, which was set for January 9, 2012. On the day of the hearing, Dr. McCord's counsel sent the letter to Dr. Smallwood stating that Dr. McCord "would not want to practice at Centennial," that he did not want to "incur the extra expense of going through the charade of presenting a case when the conclusion has already been agreed upon by the MEC," and that he "will not attend or participate in the fair hearing process at [Centennial]." As stated in his letter, Dr. McCord failed to appear at hearing.

While Dr. McCord initially sought to take advantage of the rights conferred by the bylaws, the letter to Dr. Smallwood, taken in context, had the purpose and effect of withdrawing his request for a hearing. Moreover, he did not appear at the hearing, thereby waiving his rights under the language of the bylaws. Dr. McCord's actions demonstrate an unequivocal and decisive intent to abandon the hearing process and relinquish his rights under the bylaws.[13] The contract claims were properly dismissed on the ground of waiver.

---

[13] "To demonstrate waiver by conduct, the proof must evidence some 'absolute action or inaction inconsistent with the claim or right' waived." *Regions Bank*, 422 S.W.3d at 561-62 (internal citations omitted).

**B.) *Claims for Defamation, Disparagement, and Interference with Business Relationships***

**i.) *Tenn. R. Civ. P. 12.02(1) Motion to Dismiss***

Centennial moved to dismiss the non-contract claims of defamation, common law disparagement, statutory disparagement pursuant to Tenn. Code Ann. § 47-18-104(b)(8), and intentional interference with business relationships for lack of subject matter jurisdiction, arguing that Dr. McCord failed to exhaust a remedy available under HCQIA to contest the accuracy of the NPDB report.[14]  The court granted the motion, holding that the court did not possess subject matter jurisdiction over his claims arising from the report because Dr. McCord had not challenged the accuracy of the report in the HCQIA proceeding.[15]  Dr. McCord contends that he was not required to exhaust his administrative remedies because the relief he requested–monetary damages, reinstatement of his privileges, and for Centennial to report the reinstatement of his privileges to the NPDB–do not fall within the scope of the administrative procedure.

Subject matter jurisdiction involves a court's lawful authority to adjudicate a controversy brought before it. *Northland Ins. Co. v. State*, 33 S.W.3d 727, 729 (Tenn. 2000). Courts derive their subject matter jurisdiction from the Constitution of Tennessee or from legislative acts. *Meighan v. U.S. Sprint Communications Co.*, 924 S.W.2d 632, 639 (Tenn. 1996); *Kane v. Kane*, 547 S.W.2d 559, 560 (Tenn. 1977).  They cannot exercise subject matter jurisdiction unless it has been conferred on them explicitly or by necessary

---

[14] Centennial also argued that HCQIA preempts the court from adjudicating the accuracy of the NPDB report.  Preemption is not raised as an issue in this appeal.

[15] The court also held that the claims were time-barred:

> Timeliness is also important to the Court for another reason.  This suit was filed on January 18, 2013, making it beyond the statute of limitations to challenge the actual statements made in the hearing.  The Court's previous order touched on this matter when it dismissed Counts I and II of this matter, stating that Plaintiff's claims for defamation and common-law disparagement are time-barred. *See* T.C.A. 28-3-104.  Because of this, Dr. McCord is forced to challenge the report itself, as opposed to the statements that were made.  This Court believes that this challenge to the report should have been done administratively.

Dr. McCord does not challenge the holding that his claims were barred by the applicable statute of limitations on appeal.  However, the statute of limitations applicable to each of his claims began to run on the date of publication of the NPDB report, March 2, 2012, rather than January 9, 2012, the day the statements were made, as held by the trial court.  Dr. McCord filed suit on January 18, 2013, which was within one year of the date of publication and the various claims were, therefore, timely filed.

implication. *Dishmon v. Shelby State Community College*, 15 S.W.3d 477, 480 (Tenn. Ct. App. 1999). The presence or absence of subject matter jurisdiction is a question of law which we review *de novo* without a presumption of correctness. *Northland*, 33 S.W.3d at 729; *Nelson v. Wal-Mart Stores*, 8 S.W.3d 625, 628 (Tenn. 1999). Our Supreme Court has held that, where a statute provides administrative remedies and requires that they be exhausted, a court lacks subject matter jurisdiction until the claimant has exhausted his or her remedies. *Bailey v. Blount County Bd. of Educ.*, 303 S.W.3d 216, 236 (Tenn. 2010); *Colonial Pipeline Co. V. Morgan*, 263 S.W.3d 827, 849 (Tenn. 2008).

HCQIA includes a procedure for practitioners who wish to challenge the accuracy of reports made to the NPDB. *See* 42 U.S.C. § 11136. An implementing regulation provides that a practitioner "*may* dispute the accuracy of the report within 60 days from the date on which the Secretary mails the report to the subject individual or entity." 45 C.F.R. 60.16(b) (2012) (emphasis added). The language of the regulation is permissive; a practitioner is not required to avail himself or herself of the administrative process in order to dispute the accuracy of the NPDB report. The court erred in so holding and granting the rule 12.02(1) motion.[16]

### ii.) Motion for Summary Judgment

Because we have held that the court erred in granting the Rule 12.02(1) motion, we address Centennial's argument that it was entitled to summary judgment on the non-contract claims.

Summary judgment is appropriate to resolve a case where a party can demonstrate that the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Tenn. R. Civ. P. 56.04; *accord Penley v. Honda Motor Co.*, 31 S.W.3d 181, 183 (Tenn. 2000). The moving party has the burden of persuading the court that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law. *Staples v. CBL & Assocs., Inc.*, 15 S.W.3d 83, 88 (Tenn. 2000); *McCarley v. Quality Food Serv.*, 960 S.W.2d 585, 588 (Tenn. 1998); *Byrd v. Hall*, 847 S.W.2d 208, 215 (Tenn. 1993). The moving party can meet its burden by submitting affirmative evidence that negates an essential element of the nonmoving party's claim, or by demonstrating to the court that the nonmoving party's evidence is insufficient

---

[16] When the language of a statute does not require exhaustion of remedies, or is worded permissively, "it is within a court's discretion whether to dismiss a case for failure to exhaust administrative remedies." *Bailey*, 303 S.W.3d at 236. In light of our holding, we need not address the question of whether the court abused its discretion.

to establish an essential element of the nonmoving party's claim. Tenn. Code Ann. § 20-16-101. If the moving party fails to make this showing, the motion for summary judgment fails. *Staples*, 15 S.W.3d at 88; *McCarley*, 960 S.W.2d at 588. If the movant meets its burden, then the nonmoving party "is required to produce evidence of specific facts establishing that genuine issues of material fact exist." *Martin v. Norfolk Southern Railway Co.*, 271 S.W.3d 76, 84 (Tenn. 2008) (citing *McCarley*, 960 S.W.2d at 588).

Our review of a trial court's ruling on a motion for summary judgment is a question of law; consequently, we review the record *de novo* with no presumption of correctness. *Bain v. Wells*, 936 S.W.2d 618, 622 (Tenn. 1997). We take the strongest view of the evidence in favor of the nonmoving party, allowing all reasonable inferences in its favor and discarding all countervailing evidence. *Shadrick v. Coker*, 963 S.W.2d 726, 731 (Tenn. 1998) (citing *Byrd*, 847 S.W.2d at 210-11).

The court denied summary judgment on the non-contract claims asserted by Dr. McCord, holding:

> The facts of this matter, viewed in a light most favorable to Dr. McCord, demonstrate a genuine dispute as to whether Centennial is entitled to the qualified immunity offered by § 11137(c) of HCQIA. Whether the two identified statements in the NPDB report are "false" is a question of fact because the accuracy of the report is directly related to the underlying basis for the adverse actions against Dr. McCord. The disagreement between the parties as to whether Centennial's summary suspension and permanent revocation of Dr. McCord's privileges was truly for the reasons set forth in the NPDB Report creates a question of fact. . . . (footnotes omitted).

While the accuracy of the report is "directly related" to Dr. McCord's assertion that the peer review proceeding was instituted against him for an improper purpose, the accuracy of the report is related in the same manner to the specific tort claims asserted by Dr. McCord, as more fully explained herein. Consequently we address the extent to which the record establishes an issue of material fact as to the accuracy of the report relative to those claims.

Dr. McCord asserted that the following two statements in Centennial's NPDB report are the basis his non-contract related claims and are false:

> Practitioner first came under scrutiny in June 2011 after evaluation of the practitioner's professional performance revealed concerns over the number of spinal surgery patients returning to the operating room within twelve months of the date of their original fusion procedure.

* * *

The hearing committee found that the practitioner had a pattern of performing spine surgeries on patients for whom surgery was not indicated.

A false statement or representation is an essential element of causes of action for defamation[17], common law disparagement[18], and statutory disparagement[19]; and a false statement which is alleged to be defamatory may also constitute the basis of a claim of

---

[17] To establish a claim for defamation, the plaintiff bears the burden of proving that (1) a party published a statement; (2) with knowledge that the statement was false and defaming to the other; or (3) with reckless disregard for the truth of the statement or with negligence in failing to ascertain the truth of the statement. *Hibdon v. Grabowski*, 195 S.W.3d 48, 58 (Tenn. Ct. App. 2005) (citing *Sullivan v. Baptist Mem'l Hosp.*, 995 S.W.2d 569, 571 (Tenn.1999)).

[18] The elements of a claim for common law disparagement are contained at Restatement (Second) of Torts § 623(A) (1977) which provides:

One who publishes a false statement harmful to the interests of another is subject to liability for pecuniary loss resulting to the other if (a) he intends for publication of the statement to result in harm to interests of the other having a pecuniary value, or either recognizes or should recognize that it is likely to do so, and (b) he knows that the statement is false or acts in reckless disregard of its truth or falsity.

As noted in *Moore Const. Co., Inc. v. Story Engineering Co., Inc.*, Tennessee has not specifically recognized disparagement as a tort; however, the court acknowledged that "like a claim for defamation, a claim for disparagement must be based on a false statement." No. 01A01-9606-CV-00267, 1998 WL 382198, at *4 (Tenn. Ct. App. July 10, 1998); *see also Seaton v. Trip Advisor LLC*, 728 F.3d 592, 602 (6th Cir. 2013) ("To the extent that Tennessee common law recognizes trade libel and injurious falsehood as causes of action, such claims require proof of the publication of a false statement of fact."); *Kansas Bankers Sur. Co. v. Bahr Consultants, Inc.*, 69 F.Supp.2d 1004, 1014 (E.D. Tenn. 1999).

[19] The Tennessee Consumer Protection Act creates a private right of action for unfair and deceptive acts:

Any person who suffers an ascertainable loss of money or property, real, personal, or mixed, or any other article, commodity, or thing of value wherever situated, as a result of the use or employment by another person of an unfair or deceptive act or practice described in § 47-18-104(b) and declared to be unlawful by this part, may bring an action individually to recover actual damages.

Tenn. Code Ann. § 47-18-109(a)(1). Tenn. Code Ann. § 47-18-104(b)(8) makes "disparaging the goods, services or business of another by false or misleading misrepresentations of fact" an unfair or deceptive act.

intentional interference with existing and prospective business relationships.[20] Centennial contends that there is no evidence that it made a false statement and that the statements in the report are "non-actionable opinion as a matter of law."[21] Dr. McCord contends that there is a genuine issue of material fact as to whether the report is false and whether Centennial knew it was false.

Centennial filed a statement of undisputed facts and the affidavit of Kimberly Clark, the Director of Medical Staff at Centennial, in support of its motion. In its brief on appeal, Centennial does not cite us to specific portions of this material bearing on the truth or falsity of the report; we have reviewed the record and have determined that Paragraphs 3 and 4 of Ms. Clark's affidavit as well as Paragraphs 1-4 of Centennial's statement of undisputed facts contain statements related to the falsity of the first statement. Ms. Clark's affidavit states:

3. Dr. David McCord first came under scrutiny after evaluation of the practitioner's professional performance revealed concerns over the number of spinal surgery patients returning to the operating room within twelve months of the date of their original fusion procedure.

4. An investigation was conducted by an ad hoc committee and the findings presented to the Medical Executive Committee.

The pertinent statement of undisputed facts are:

1. Ilene Marshall, administrative quality coordinator at Centennial Medical Center, determined that Dr. David McCord performed surgery to remove spinal hardware on nineteen (19) patients within one (1) year of implantation of the hardware. She concluded there was no hardware failure in those nineteen (19) cases.

---

[20] To establish a claim for intentional interference with existing and prospective business relationships, the plaintiff must demonstrate the (1) existence of a business relationship with specific third parties or a prospective relationship with an identifiable class of third persons; (2) that the defendant had knowledge of that relationship and not a mere awareness of the plaintiff's business dealings with others in general; (3) that the defendant intended to cause the breach or termination of the business relationship; (4) that the defendant had an improper motive or used improper means; and (5) damages resulting from the tortious interference. *Trau-Med of America, Inc. v. Allstate Ins. Co.*, 71 S.W.3d 691, 700 (Tenn. Ct. App. 2005) (citations omitted). Improper means may be demonstrated by proving defamation. *Id.* at 700 n.5.

[21] Centennial also contends that 42 U.S.C. § 11137(c) relieves it from liability for the report made to the NPDB without knowledge of the falsity of the information contained therein.

Source: Complaint, ¶ 11.[22]

2. Dr. Michael Schlosser, Chief of the Department of Surgery at Centennial, reviewed the propriety and necessity for those nineteen (19) surgical procedures to remove previously implanted spinal hardware.
Source: Complaint, ¶ 12.

3. Dr. McCord attended a meeting with Dr. F.J. Campbell, the Chief medical officer at Centennial Medical Center, to address the circumstances and propriety of the nineteen (19) surgeries. During the meeting, Dr. Campbell made a presentation concerning the nineteen (19) cases reviewed by Dr. Schlosser and expressed the opinion that the cases represented and divulged problems with Dr. McCord's practice.
Source: Complaint, ¶ 13.

4. The Medical Executive Committee ("MEC") of the medical staff at Centennial Medical Center appointed an Ad Hoc Committee of four (4) physicians to review Dr. McCord's care in those nineteen (19) cases. After reviewing only those cases, the Committee expressed concerns over the number of spinal surgery patients that were returning to the operating room within twelve (12) months of the date of the original surgical procedure. The Committee met with Dr. McCord on June 6, 2011, and informed him that his hardware removal rate within one (1) year of implantation was five (5) times greater than the next highest rate of nearly a dozen surgeons who performed the same or similar surgery at Centennial.
Source: Complaint, ¶ 18.
* * *
20. Each of the sentences describing Centennial's action against Dr. McCord accurately reported the underlying action against Dr. McCord[23][:]

_____

[22] Generally, factual statements contained in pleadings are judicial admissions that are conclusive against the pleader in the proceedings in which they are filed unless they have been amended or withdrawn, but under the latter circumstance continue to be evidentiary admissions. *First Tennessee Bank, N.A. v. Mungan*, 779 S.W.2d 798, 801 (Tenn. Ct. App. 1989) (citing *Pankow v. Mitchell*, 737 S.W.2d 293 (Tenn. Ct. App. 1987)). Thus, we consider the cited portions of the complaint as admissions of Dr. McCord.

[23] Paragraph 20 of Centennial's statement of undisputed facts incorporated a chart with two adjoining columns. The first column was titled "Sentence from NPDB Report," which contained a separate section for each sentence in the report that described the action taken by Centennial. The adjoining column was titled "Source confirming factually accurate reporting," which corresponded with each sentence and listed the source that allegedly corroborated the accuracy of that sentence. We have chosen not to reproduce the
(continued...)

-15-

Practitioner first came under scrutiny in June 2011 after evaluation of the practitioner's professional performance revealed concerns over the number of spinal surgery patients returning to the operating room within twelve months of the date of their original fusion procedure.
Source: Complaint ¶ 18, Exhibit 2, Clark Affidavit ¶¶ 3, 15.

Ms. Clark's affidavit and the quoted portions of Centennial's statement of facts are evidence that Dr. McCord came under scrutiny in June 2011 after Ms. Marshall collected data on spinal hardware removal rates and the subsequent review of that data by Dr. Schlosser; that Dr. McCord was informed about concerns with his practice by Dr. Campbell; and that Dr. McCord attended a meeting on June 6, 2011, in which the ad hoc committee informed him that his hardware removal rate was higher than his peers. This is evidence that the first statement in the NPDB report was not false, thereby negating an essential element of the non-contract claims and shifting the burden to Dr. McCord to introduce evidence establishing a genuine issue of material fact in that regard.

In response to the motion for summary judgment, Dr. McCord filed a Tenn. R. Civ. P. 72 declaration, a response to Centennial's statement of undisputed facts, and his own statement of additional undisputed facts.[24] Dr. McCord's responses to the statements quoted above state:

1. RESPONSE: Admitted for the purposes of summary judgment. It is further admitted that Ms. Marshall did not include in her definition of "hardware failure" the loosening of screws, motion of the hardware, hardware-generated scarring and/or pain, or any number of other difficulties that may arise from spinal hardware placements, but do not qualify as actual mechanical failure of the spinal implant. (Compl. ¶ 11; McCord Dec. ¶ 1.)

2. RESPONSE: Denied as stated. It is admitted for the purposes of summary judgment that Dr. Schlosser, a direct competitor of Dr. McCord, was tasked with determining the appropriateness, propriety, and/or necessity of the above referenced nineteen (19) surgical procedures. (Compl. ¶ 12; McCord Dec. ¶ 4.)

---

[23](...continued)
chart in full and have determined that the portions quoted in this section of the opinion are pertinent to the resolution of whether the statements are false; accordingly, any subsequent references to Paragraph 20 will only contain the portions relevant to resolving the truth or falsity of the statement at issue.

[24] Centennial did not respond to Dr. McCord's statement of undisputed facts.

3. RESPONSE: Admitted for the purposes of summary judgment.

4. RESPONSE: Denied as stated. Dr. McCord admits that Centennial's Medical Executive Committee appointed an Ad Hoc Committee, that included and was led by Dr. Schlosser, to investigate him. Dr. McCord admits that the Ad Hoc Committee met with him on June 6, 2011, and informed him that his hardware removal rate within one (1) year of implantation was 7.5%, while the next highest rate at Centennial was 1.5%. It is further admitted that the national average for hardware removal within one (1) years was, at that time, 10%. (McCord Dec. ¶ 7.)

20. RESPONSE: Denied. It is denied that Dr. McCord "first came under scrutiny in June of 2011 after evaluation of the practitioner's professional performance revealed concerns over the number of spinal surgery patients returning to the operating room within twelve months of the date of their original fusion procedure." (See McCord Dec. ¶¶ 22-24; Pl's Memo. in Resp. to Def's Motion to Dismiss and Alternative Motion for Summary Judgment.)

Taken as a whole and in context, Dr. McCord's responses to Centennial's statement of undisputed facts, the portions of his declaration cited by him, and his own statement of undisputed facts, do not establish a genuine issue of fact regarding the truth or falsity of the first statement in the report. To a large extent, they contain argumentative and/or conclusory statements that are directed toward challenging the appropriateness of the methodology of the investigation of his surgical practices and the sufficiency of the results of the investigation to support the revocation of his privileges.[25]

The following portions of Ms. Clark's affidavit are evidence that the second statement, that Dr. McCord had a pattern of performing unnecessary surgeries, was not false:

9. The three (3) physician Fair Hearing panel approved the MEC's recommendation after affirming that the recommendation had a substantial factual basis and it was not arbitrary, unreasonable, or capricious.

---

[25] For example, in paragraph 23 of his declaration, Dr. McCord states that "spinal surgery patients return[ing] to the operating room within twelve months of their original fusion surgery . . . is not a recognized criteria for evaluating adverse outcomes identified by the medical literature." This conclusory statement is not evidence that the statement in the report was false. In our analysis, we determine only whether there is evidence that the content of the report was false; such conclusory statements are not material to our inquiry.

10. The Hearing Report described the three (3) physician Fair Hearing panel members' conclusion and evaluation of the evidence presented.

11. The Fair Hearing panel indicated that it was persuaded by evidence demonstrating that Dr. McCord had a pattern of performing spine surgeries on patients for whom it was not indicated.

The following paragraphs from Centennial's statement of undisputed facts are also pertinent in this regard:

11. Centennial proceeding with the Fair Hearing and review of Dr. McCord's summary suspension on January 9, 2012, even though Dr. McCord did not appear. Centennial presented testimonial and documentary evidence in support of the MEC's decision to summarily suspend Dr. McCord's privileges.
Source: Complaint, ¶ 25-44, Exhibit 11.
* * *
14. The written report of the Fair Hearing Committee described the members' conclusions and evaluation of the evidence presented.
Source: Complaint, Exhibit 11.
* * *
20. Each of the sentences describing Centennial's action against Dr. McCord accurately reported the underlying action against Dr. McCord[:]

A Fair Hearing was conducted to consider the practitioner['[]s appeal of the MEC's recommendation. (footnote omitted).
Source: Complaint, ¶ 25, Exhibit 11; Affidavit of Kimberly Clark, ¶¶ 3, 15.

The hearing committee found that the practitioner had a pattern of performing spine surgeries on patients for whom is not indicated.
Source: Complaint, Exhibit 11; Affidavit of Kimberly Clark, ¶¶ 11, 15.

The hearing committee approved the MEC's recommendation after affirming that the recommendation had a substantial factual basis and it was not arbitrary, unreasonable, or capricious.
Source: Complaint, Exhibit 11; Affidavit of Kimberly Clark, ¶¶ 9, 15.

This material is evidence that the Fair Hearing panel reviewed the evidence presented at the hearing and determined that Dr. McCord had a pattern of performing unnecessary surgeries and that the statement was true, shifting the burden to Dr. McCord to come forward with

evidence to show that there is a genuine issue of fact regarding the falsity of the second statement.

Dr. McCord responded to the aforementioned statements of fact as follows:

11. RESPONSE: Admitted.
* * *
14. RESPONSE: Admitted for the purposes of summary judgment that the Fair Hearing Committee described the alleged members' conclusions and evaluation of the evidence presented.
* * *
20. RESPONSE: Denied. . . . It is denied that "[t]he hearing committee found that [Dr. McCord] had a pattern of performing spinal surgeries on patients for whom is not indicated." It is denied that the MEC's "recommendation had substantial factual basis and was not arbitrary, unreasonable, or capricious." (See McCord Dec. ¶¶ 22-24; Pl's Memo. in Resp. to Def's Motion to Dismiss and Alternative Motion for Summary Judgment.)

Dr. McCord's responses and the cited portions of his declaration are, again, argumentative and conclusory and do not assert facts which create an issue for trial related to the truth or falsity of the second statement.[26]

The essential element in each of Dr. McCord's claims were that the statements were false, which Centennial negated by producing evidence of their veracity. Dr. McCord has failed to meet his burden of producing evidence that would create a genuine issue of fact as to the falsity of those statements; consequently, the court erred in denying Centennial's motion for summary judgment. Our holding pretermits Centennial's contention that the statements in the report are non-actionable opinion.

### iii.) Ulterior Motive

Inasmuch as we have held that there was not a genuine issue of fact as to the falsity of the statements, we address Dr. McCord's further argument that Centennial is not entitled to summary judgment because it had an ulterior motive for the peer review action. He argues that if a jury could determine that the underlying basis for the action was not in the

---

[26] His response to statement 20 is simply to deny the words written on the report; this fails to comply with his responsibility under Tenn. R. Civ. P. 56.03 to file a response "demonstrating that the fact is disputed."

furtherance of quality healthcare then it could also find that the NPDB report was false and that the hospital knew it was false.[27]

Generally, if a peer review action meets the standards set forth in 42 U.S.C. § 11112(a), then the peer review body, its members and staff, and others who participate in the proceeding will not be liable for monetary damages "under any law of the United States or of any State (or political subdivision thereof) with respect to the" professional review action. 42 U.S.C. § 11111(a)(1).[28]  For this immunity to apply, a peer review action must be taken:

> (1) in the reasonable belief that the action was in the furtherance of quality health care;
> (2) after a reasonable effort to obtain the facts of the matter;
> (3) after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances; and
> (4) in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts and after meeting the requirement of paragraph (3).

42 U.S.C. § 11112(a).  The statute further provides that a professional review action shall be "presumed" to have met these standards unless this presumption is rebutted by a preponderance of the evidence.  *Id*.  Because of this presumption, Dr. McCord has the burden to produce "'evidence that would allow a reasonable jury to conclude that the Hospital's peer review disciplinary process failed to meet the standards of HCQIA.'" *Peyton v. Johnson City*

---

[27] Dr. McCord relies on *Ritten v. Lapeer Regional Medical Center*, a case in which a doctor asserted a claim of retaliation under the Emergency Medical Treatment and Active Labor Act, 42 U.S.C. § 1395dd, against Lapeer Regional Medical Center ("LRMC") and state law claims of tortious interference, defamation and breach of contract against the hospital, its president and CEO, its chief nursing officer, and three obstetricians who held privileges at LRMC arising out of the suspension of his privileges at LRMC. 611 F.Supp.2d 696, 704-05 (E.D. Mich. 2009).  On the defendants' motion for summary judgment on the basis that they were immune pursuant to 42 U.S.C. § 11111(a)(1), the court held that there was a question of fact as to whether the action taken against the doctor was in retaliation for an incident with a patient rather than in the furtherance of quality healthcare, and that if a trier of fact could conclude that the action against the doctor was retaliatory then that would "permit the further conclusion that the report to the [NPDB] was false, and that [the hospital] knew it was false." *Id.* at 720, 733.  The court, accordingly, denied summary judgment on the doctor's claim for defamation.  *Id*. at 736.

[28] The trial court and parties have characterized this protection under HCQIA as "immunity"; this characterization has been adopted in numerous cases applying HCQIA and is not raised as an issue on appeal. For the sake of consistency, we will use the term as well.

*Medical Center*, 101 S.W.3d 76, 83 (Tenn. Ct. App. 2002) (quoting *Brader v. Allegheny General Hospital*, 167 F.3d 832, 839 (3d Cir.1999)).

Dr. McCord only challenges whether Centennial acted in the reasonable belief that it was furthering quality healthcare; consequently, we address § 11112(a)(1). In our determination of whether the peer review action was instituted in accordance with § 11112(a)(1), we employ an objective standard of reasonableness. *Peyton*, 101 S.W.3d at 84.[29]

Dr. McCord asserts that there is a question of fact as to whether the action taken against him was "truly for the reasons set forth in the NPDB Report . . . ." As evidence that the hospital had an ulterior motive, Dr. McCord cites Paragraphs 22-24 of his declaration which state[30]:

22. I did not have a pattern of performing spine surgeries on patients for whom surgery was not indicated.

23. The fact that nineteen (19) of my spinal surgery patients returned to the operating room within twelve months of their original fusion surgery does not warrant concern and is not a recognized criteria for evaluating adverse outcomes identified by the medical literature. This was a statistical reference, created by Centennial because of its history with another spine surgeon who is no longer on staff, which Dr. Schlosser improperly used to remove me as competition at Centennial. The entire peer review was not due to any concern for the safe provision of medical care but for this ulterior motive.

24. The National Practitioner Data Bank ("NPDB") report submitted on March 2, 2012, inaccurately describes Centennial's independent medical staff adverse action against me and is therefore false. . . .

---

[29] In *Peyton,* this court adopted the following standard for determining whether a hospital's action is taken in the furtherance of quality healthcare:

[T]he good or bad faith of the reviewers is irrelevant. "The real issue is the sufficiency of the basis for the [Hospital's] actions." The "reasonable belief" standard articulated in § 11112(a)(1) will be satisfied "if the reviewers, with the information available to them at the time of the professional review action, would reasonably have concluded that their actions would restrict incompetent behavior or would protect patients."

101 S.W.3d at 84 (internal citations omitted).

[30] These paragraphs are also cited in Dr. McCord's Statement of Additional Undisputed Facts, to which Centennial did not respond.

These statements do not provide evidence from which a jury could conclude that Centennial's peer review process failed to meet the standards of HCQIA. Paragraphs 22 and 24 are conclusory in nature and do not present factual evidence of an ulterior motive on the part of Centennial. Likewise, the statements in Paragraph 23 that the return of his patients "within twelve months . . . does not warrant concern . . . ." and that the peer review action was not motivated by "the safe provision of medical care but for [an] ulterior motive" are conclusory and not factual evidence. The remaining portions of Paragraph 23, which focus on Centennial's use of certain criteria to evaluate his surgical practice, constitute further argument relative to the basis of Dr. McCord's disagreement with what precipitated the peer review proceeding, but the statements are not evidence that Centennial was motivated by something other than a reasonable belief that its action would further quality health care. There is no triable issue of fact as to the motive for the proceeding presented by the record and Centennial is entitled to the benefit of the presumption at 42 U.S.C. § 11112(a).

### C.) *Injunctive Relief*

Dr. McCord also contends that he is entitled to injunctive relief in the form of reinstatement of his privileges at Centennial and the reporting of his reinstatement to the NPDB. Dr. McCord does not state the legal grounds for injunctive relief; however, the only basis for reinstatement would flow from his contractual rights under the bylaws. We have earlier held that Dr. McCord waived his rights under the bylaws by failing to appear at the hearing, and thereby accepted Centennial's decision to revoke his privileges; in so doing, he also waived his right to relief for any asserted violations under the bylaws. Therefore, Dr. McCord is not entitled to injunctive relief.

## III. CONCLUSION

For the foregoing reasons, we affirm the dismissal of the breach of contract claims, reverse the dismissal of the non-contract claims for lack of subject matter jurisdiction; we hold that Centennial is entitled to summary judgment on the remaining claims and, accordingly, dismiss the case.

_____
RICHARD H. DINKINS, JUDGE